1   Lester O. Brown (SBN 160828)
    Fiona A. Chaney (SBN 227725)
2   HOWREY LLP
    550 South Hope Street, Suite 1100
3   Los Angeles, California  90071
    Telephone:  (213) 892-1800
4   Facsimile:  (213) 892-2300
    Email: brownl@howrey.com; chaneyf@howrey.com
5
6   Attorneys for Plaintiff Intel Corporation

7

8                   UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                       SAN JOSE DIVISION

11

| | |
|---|---|
| 12  INTEL CORPORATION, A DELAWARE CORPORATION, | ) Case No.  C09-00299-JF |
| 13 | ) **MEMORANDUM OF POINTS AND** |
|          Plaintiff, | ) **AUTHORITIES IN SUPPORT OF** |
| 14 | ) **PLAINTIFF INTEL CORPORATION'S** |
|     vs. | ) **MOTION FOR PARTIAL SUMMARY** |
| 15 | ) **JUDGMENT AGAINST DEFENDANT** |
| 16  AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, A NEW YORK CORPORATION, | ) **AMERICAN GUARANTEE AND** ) **LIABILITY INSURANCE COMPANY** |
| 17 | ) **The Honorable Jeremy Fogel** |
| 18          Defendant. | ) ) **[ADMINISTRATIVE MOTION TO FILE** |
| 19 | ) **UNDER SEAL PENDING]** |
| 20  MARKEL AMERICAN INSURANCE COMPANY, a Virginia Corporation, | ) ) **Date:   March 26, 2010** |
| 21 | ) **Time:   9:00 a.m.** |
|          Counterclaimant, | ) **Dept:   3** |
| 22 | ) |
|     vs. | ) |
| 23 | ) |
| 24  INTEL CORPORATION, a Delaware Corporation, and AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, a New York Corporation, | ) ) ) |
| 25 | ) |
| 26 | ) |
|          Counterclaim Defendant. | ) |
| 27 | ) |

28

1

# TABLE OF CONTENTS

2

**Page(s)**

3   TABLE OF CONTENTS ................................................................................................................I

4   I.      STATEMENT OF ISSUES TO BE DECIDED...............................................................1

5   II.     FACTS ..........................................................................................................................1

6           A.      The Underlying AMD Actions ..........................................................................1

7                   1.      *AMD v. Intel* ........................................................................................1

8                   2.      Consumer Class Actions ........................................................................3

9           B.      The Insurance Policies ......................................................................................5

10                  1.      The AGLI Follow Form Policy ..............................................................5

11                  2.      The Underlying XL Policy......................................................................6

12          C.      The *Intel v. XL* Action .....................................................................................7

13  III.    ARGUMENT .................................................................................................................8

14          A.      Summary Judgment Standard ............................................................................8

15          B.      The Liberal Rules of Policy Interpretation ........................................................8

16          C.      The Duty To Defend Is Much Broader Than The Duty To
                    Indemnify. ......................................................................................................10

17

18          D.      AGLI Has A Duty To Defend The Underlying AMD Actions. .........................12

19                  1.      The Allegations Of The Underlying Complaints Are At
                            Least *Potentially* Covered Under The Advertising Liability
                            Coverage Wording At Issue. ................................................................12

20

21                          a.      The underlying complaints allege "offenses" arising
                                    from Intel's "advertisement" or "promotion."........................12

22                          b.      The offenses do not have to be "like" the offenses
                                    listed in the Policies' definition of Advertising

23                                  Liability. ...............................................................................16

24                          c.      The offenses alleged in the Underlying AMD
                                    Actions constitute "unfair competition," as one of

25                                  the listed offenses.................................................................18

26                  2.      The Policies Do Not Contain An Antitrust Exclusion..........................22

27          E.      The XL 01-02 Policy Is Exhausted ..................................................................23

28  IV.     CONCLUSION ...........................................................................................................25

HOWREY LLP

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbott v. Bragdon,*
    912 F. Supp. 580 (D. Me. 1995)........................................................................................ 16

*Abenante v. Fulflex, Inc.,*
    701 F. Supp. 296 (D.R.I. 1998)........................................................................................ 16

*Aerojet-General Corp. v. Transp. Indem. Co.,*
    17 Cal. 4th 38 (1997)........................................................................................................ 24

*A-H Plating Inc. v. Am. Nat'l Fire Ins. Co.,*
    57 Cal. App. 4th 427 (1997)............................................................................................. 10

*AIU Ins. Co. v. Superior Court,*
    51 Cal. 3d 807 (1990).............................................................................................8, 9, 12, 13

*Am. Cyanamid Co. v. Am. Home Assurance Co.,*
    30 Cal. App. 4th 969 (1994)............................................................................................. 21

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242.,
    106 S. Ct. 2505 (1986)....................................................................................................... 8

*Bank of the West v. Superior Court,*
    2 Cal. 4th 1254 (1992).................................................................................................passim

*Barnett v. Fireman's Fund Ins. Co.,*
    90 Cal. App. 4th 500, 510 (2001).................................................................................... 11

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.,*
    5 Cal. 4th 854 (1993)......................................................................................................... 9

*Buss v. Superior Court,*
    16 Cal. 4th 35 (1997)....................................................................................................... 11

*CD Invest. Co. v. California Ins. Guar. Ass'n.,*
    84 Cal. App. 4th 1410, 1428 (2000)................................................................................ 25

*Century Sur. Co. v. Polisso,*
    139 Cal. App. 4th 922 (2006)........................................................................................... 11

*Delgado v. Heritage Life Ins. Co.,*
    157 Cal. App. 3d 262 (1984)............................................................................................. 9

*Flanagan v. Flanagan,*
    27 Cal. 4th 766 (2002)..................................................................................................... 17

*Gray v. Zurich Ins. Co.,*
    65 Cal. 2d 263 (1966)...............................................................................................9, 10, 11

*H.E. Williams Inc. v. U.S. Fire Ins. Co.*,
  No. 89-5083-CV-SW-1,
  1991 U.S. Dist. LEXIS 1017 (W.D. Mo. Jan. 28, 1991) ....................................................17, 18

*Hewlett Packard Co. v. Ace Prop. & Cas. Co.*,
  2003 U.S. Dist. LEXIS 3586 (N.D. Cal. Mar. 3, 2003)......................................................19, 20

*Hewlett-Packard Co. v. Cigna Prop. & Cas. Ins. Co.*,
  No. 99-20207SW, 1999 U.S. Dist. LEXIS 20655 (N.D. Cal. Aug. 24,
  1999)........................................................................................................................19, 21, 22

*Horace Mann Ins. Co. v. Barbara B.*,
  4 Cal. 4th 1076 (1993) ............................................................................... 10, 11, 20, 21

*Industrial Indem. Co. v. Apple Computer Inc.*,
  79 Cal. App. 4th 817 (1999) ............................................................................................ 20

*Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group*,
  50 Cal. App. 4th 548 (1996)............................................................................................ 22

*Live Nation, Inc. v. Ill. Nat'l Ins. Co.*,
  No. 07-56658, 2009 U.S. App. LEXIS 3401 (9th Cir. Feb. 20, 2009)................................ 22

*Montgomery Ward & Co. v. Imperial Cas. & Indem. Co.*,
  81 Cal. App. 4th 356 (2000)............................................................................................ 25

*Montrose Chem. Corp. v. Admiral Ins. Co.*,
  10 Cal. 4th 645 (1995) ...................................................................................................... 9

*Montrose Chem. Corp. v. Superior Court*,
  6 Cal. 4th 287 (1993).................................................................................................10, 11

*N. Am. Bldg. Maint., Inc. v. Fireman's Fund Ins. Co.*,
  137 Cal. App. 4th 627 (2006) .......................................................................................... 10

*Ortega Rock Quarry v. Golden Eagle Ins. Corp.*,
  141 Cal. App. 4th 969 (2006) .......................................................................................... 17

*People v. Clark-van Brunt*,
  158 Cal. App. 3d Supp. 8 (1984) ..................................................................................... 16

*People v. Gonzalez*,
  116 Cal. App. 4th 1405 (2004)......................................................................................... 17

*Reagan Nat'l Adver. v. Hartford Cas. Ins. Co.*,
  No. 05-4131, 2006 U.S. App. LEXIS 18744 (10th Cir. July 24, 2006) ................................ 22

*Scott v. Continental Ins. Co.*,
  44 Cal. App. 4th 24 (1996) .............................................................................................. 12

*Scottsdale Ins. Co. v. MV Transp.*,
  36 Cal. 4th 643 (2005).................................................................................................... 11

*Truck Ins. Exch. v. Amoco Corp.*,
  35 Cal. App. 4th 814 (1995)............................................................................................ 25

HOWREY LLP

iii
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTEL'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. C09-00299-JF

*Vandenberg v. Superior Court,*
 21 Cal. 4th 815 (1999) ............................................................................................ 9

*Wausau Underwriters Ins. Co. v. Unigard Sec. Ins. Co.,*
 68 Cal. App. 4th 1030 (1998) ........................................................................10, 11, 23

*White v. Texas,*
 No. 07-00-0473-CR, 2002 Tex. App. LEXIS 5196 (Ct. App. Texas, July
 24, 2002) .................................................................................................................. 17

**STATUTES**

Cal. Bus. & Prof. Code § 16720 ............................................................................... 12

Cal. Bus. & Prof. Code § 16727 ............................................................................... 12

Cal. Bus. & Prof. Code § 16750(a) ........................................................................... 13

Cal. Bus. & Prof. Code § 17045 ............................................................................... 12

Cal. Bus. & Prof. Code § 17200 ..........................................................................20, 21

Cal. Civ. Code § 1636 ................................................................................................. 8

Cal. Civ. Code § 1639 ................................................................................................. 8

Cal. Civil Code § 1641 ........................................................................................... 9, 16

Fed. R. Civ. P. 56 (c)(2) .............................................................................................. 8

Fed. R. Civ. P. 56(c) ................................................................................................... 8

**OTHER AUTHORITIES**

The American Heritage College Dictionary, Third Edition, 2000 .............................. 12

Webster's Collegiate Dictionary, Tenth Edition, 1996 ..........................................12, 13

**HOWREY LLP**

1 **I.     STATEMENT OF ISSUES TO BE DECIDED**

2          The Court should summarily adjudicate that: (i) Defendant American Guarantee And Liability

3 Insurance Company ("AGLI") has a duty to defend Plaintiff Intel Corporation ("Intel") in the

4 Underlying AMD Actions because the allegations of the Underlying AMD Actions are at least

5 potentially covered under the Advertising Liability coverage of AGLI's Policy; and that (ii) AGLI's

6 duty arose at the time Intel tendered those Underlying AMD Actions to AGLI.

7 **II.    FACTS**

8          **A.     The Underlying AMD Actions**

9                  **1.     *AMD v. Intel***

10         On June 27, 2005, Advanced Micro Devices ("AMD") filed an action entitled *Advanced Micro*

11 *Devices, Inc. v. Intel Corporation*, Case No. 05-441, in the United States District Court for Delaware

12 (the "AMD Action") alleging that Intel engaged in unfair business practices and anticompetitive

13 conduct in its advertising, promotion, sale and marketing of its microprocessors resulting in damages

14 to AMD.  The activities and damages, at least in part, purportedly took place during the AGLI Policy

15 period.

16         The complaint in the AMD Action sought: (i) damages and treble damages for AMD's alleged

17 lost profits; (ii) injunctive relief prohibiting Intel from engaging in "further conduct unlawful under

18 Section 2 of the Sherman Act or Section 17045 of the California Business & Professional Code;" and

19 (iii) attorney's fees and costs for the action.  Intel's Request for Judicial Notice in Support of Its

20 Motion for Partial Summary Judgment ("RJN"), Exh. A (*AMD v. Intel* Complaint).  On November 12,

21 2009, AMD and Intel settled this dispute without any admission or finding of liability.  RJN, Exh. F

22 (AMD - Intel Settlement Agreement).

23         The AMD Action Complaint alleged, among other things, that:

24                  OEMs [original equipment manufacturers] have adopted a variety of

25                  business models, including sales directly to customers through web-

26                  based e-commerce, sales through company-employed sales staffs (who

27                  target IT professionals and Fortune 1000 companies) and sales though a

28

-1-

1  network of independent distributors (who focus on smaller business

2  customers). With the exception of Dell, which markets to consumers

3  only directly (mostly over the internet), most OEMs also sell through

4  retail chains. Intel and AMD compete not only to have OEMs

5  incorporate their microprocessors into their retail platforms but also to

6  convince retailers to allocate shelf-space so that the platforms containing

7  their respective microprocessors can be purchased in the retailers' stores.

8  Through its economic muscle and relentless marketing – principally its

9  "*Intel Inside*" and "*Centrino*" programs which financially reward OEMs

10  for branding their PCs as Intel machines – Intel has transformed the

11  OEM world. . . .

12  RJN, Exh. A (*AMD v. Intel* Complaint at ¶¶ 32-33). The "Intel Inside Program" is a promotional

13  discounting program which was created to

14  '

**REDACTED**

15

16  Declaration of Fiona Chaney in

17  Support of Intel's Motion for Partial Summary Judgment ("Chaney Decl."), ¶ 3 and Exh. A (Intel

18  Inside Program 66720DOC0000010)(under seal). Explained differently, the "Intel Inside Program" is

19  a cooperative promotional, advertising and trademark licensing program with Intel customers, typically

20  used to create demand in the market for personal computer products and to amplify Intel's and its

21  customers' (OEMs) direct marketing efforts to end users (consumers).[1]

22  The AMD Action Complaint also alleges:

23  Most of the PCs sold at retail are sold during four or five "buying

24  seasons" that correspond to events on the calendar ("Dads and Grads,"

25

26  ───────────────

[1] The "Centrino" program is a similar promotional discounting program that involves similar

27  advertising and promotion related benefits but the alleged advertising activity relating to the
"Centrino" program would not have taken place until after 2003 (outside of the AGLI Policy period).

28

1   "Back to School," "Holiday," etc.), and retailers refresh their inventory

2   for each.  A chipmaker faces a two-step process to get its platform on

3   retail shelves: first, it must convince one or more OEMs to build

4   machines using its microprocessor at a suggested price point (called

5   "getting on the roadmap"); and second, it must convince the retailer to

6   stock and devote shelf space to these machines.  Shelf space does not

7   come for free.  The major retailers demand market development funds

8   ("MDF") in exchange.  MDF can consist of cooperative advertising

9   support, but more frequently it comprises a marketing-related

10  opportunity that a chipmaker must buy for tens of thousands of dollars,

11  for example, space in a Sunday circular, an in-store display or an internet

12  training opportunity with the chain's sales staff.  The MDF required to

13  secure shelf space can run as high as $25 per box depending on the

14  computer price point and how urgently the competing chipmakers want

15  the shelf space.

16  RJN, Exh. A (*AMD v. Intel* Complaint, ¶ 97).

17      In essence, AMD alleged that the Intel Inside Program and Intel's use of MDF, both of which

18  are promotional discounting programs with advertising components, were used offensively to

19  encourage OEMs to buy only Intel's discounted microprocessor products, and not AMD's products

20  thereby resulting in unfair competition and, ultimately, damage to AMD.

21              **2.      Consumer Class Actions**

22      On July 12, 2005, plaintiffs filed a class action entitled *Paul v. Intel Corporation*, Case No. 05-

23  485, in the same court as the *AMD v. Intel* Action.  The plaintiffs there assert seven claims against Intel

24  and seek monetary damages (the "*Paul* Action").  RJN, Exh. B (*Paul* Complaint).  Shortly after the

25  filing of the *Paul* Action, more than 80 consumer class actions were filed against Intel, alleging

26  anticompetitive practices in the advertising, promotion, sale, and marketing of its microprocessors.

27  These putative class actions were consolidated as multi- district litigation, along with the *Paul* Action

28

-3-
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTEL'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

1   into *In re Intel Corporation Microprocessor Antitrust Litigation*, MDL No. 1717-JJF.  Additionally,

2   there are six class actions, with similar allegations to the *Paul* Action, pending in state court in

3   California.  These six actions are consolidated in the Superior Court of California, Santa Clara County

4   ("the Underlying California Actions").  Collectively, all of these consumer lawsuits (both those that are

5   part of the multi-district litigation in Delaware and those in California state court) are referred to herein

6   as the Consumer Class Actions.  The Consumer Class Actions all allege conduct related to Intel's

7   advertising, promotion, sales and marketing activities.  The activities and damages, at least in part,

8   purportedly took place during the AGLI Policy period.

9         The *Paul* Complaint contains many allegations identical to those in the AMD Complaint,

10  including the allegations relating to retailer demands for market development funds from Intel in

11  exchange for marketing related opportunities.  RJN, Exh. B (*Paul* Complaint, ¶ 61).  Similarly,

12  paragraphs 98 and 99 in the Master Class Action Complaint in the Underlying California Actions

13  contain the identical allegations found in paragraph 97 of the AMD Action Complaint and paragraph

14  61 of the *Paul* Complaint.  RJN, Exhs. C and B, respectively.  Additionally, both the *Paul* and Master

15  Class Action Complaints allege that "Intel also offers a panoply of special programs for distributors

16  who carry Intel microprocessors exclusively: marketing bonuses, increased rebates, credit programs for

17  new customers . . ."  RJN, Exh. B (*Paul* Complaint, ¶ 58) and Exh. C (Master Complaint, ¶ 91)   In

18  other words, the Consumer Class Actions similarly allege that Intel's promotional discounting

19  programs (the Intel Inside Program and MDF) constituted unfair competition for AMD such that

20  consumers were damaged by having to pay higher prices for computers.

21        Although the *AMD v. Intel* Action settled in November 2009, the Consumer Class Actions are

22  still pending.  The hearing for class certification presently is set for mid-April, 2010.  RJN, Exh. E

23  (December 9, 2009 Order Granting Stipulation and Order Regarding Class Certification Briefing

24  Schedules).

25        Through January 10, 2010, Intel incurred and paid     REDACTED

26  defense costs for the Underlying AMD Actions, triggering the AGLI Policy.  Declaration of Malou

27

28

-4-
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTEL'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

DeLeon in Support of Intel's Motion for Partial Summary Judgment ("DeLeon Decl."), ¶ 4 (filed under seal).

### B. The Insurance Policies

#### 1. The AGLI Follow Form Policy

Intel, through an insurance broker, Marsh, purchased several layers of comprehensive liability insurance from a variety of insurance companies for the April 1, 2001 through April 1, 2002 time period. Those occurrence-based comprehensive liability policies intercept at the $16 million level because they sit above (i) an $11 million retention and (ii) a fronting policy issued by Old Republic Insurance Company ("ORIC") with a limit of $5 million in the aggregate, including defense costs. The defense costs incurred by Intel in defending the Underlying AMD Actions exhausted the retention and the ORIC fronting policy some time ago.

Sitting immediately above the $11 million retention and $5 million fronting policy, and directly below the AGLI Policy, is Commercial Umbrella Policy No. HFL 004-27-84-01, sold by XL Insurance America, Inc.[2] ("XL") to Intel, which provides $50 million in coverage for defense and/or indemnity in excess of the retention/fronting policy for each occurrence and in the aggregate resulting in Ultimate Net Loss to Intel, as defined, during the policy period of April 1, 2001 to April 1, 2002 (the "XL 01-02 Policy"). Declaration of Diane Labrador in Support of Intel's Motion for Partial Summary Judgment ("Labrador Decl."), ¶¶ 2, 4 and Exh. B (XL 01-02 Policy). The XL 01-02 Policy includes defense costs within limits. The XL 01-02 Policy contains broader coverage than typical Advertising Liability provisions as it covers liability on account of "Advertising Liability" which is defined to include:

> Injury arising out of offenses *such as, but not limited to*, libel, slander, defamation, infringement of copyright, title (including trademark) or slogan, piracy, *unfair competition*, idea misappropriation (including trade secrets), breach of confidential information, electronic mail intercepts, misappropriation of the style of doing business (including

---

[2] Previously known as Winterthur International America Insurance Company.

1   website/homepage design), or invasion of rights of privacy ***committed,***

2   ***or alleged to have been committed***, in any software, ***advertisement,***

3   ***promotion***, publicity article, broadcast or telecast.

4   *Id*. (XL 01-02 Policy, at § III (E)) (emphasis added).[3]  The defense costs incurred by Intel in defending

5   the Underlying AMD Actions and the settlement with XL have exhausted the $50 million aggregate

6   limit of the XL 01-02 Policy.  DeLeon Decl., ¶ 4 (under seal).

7   AGLI sold Intel a Following Form Excess Liability Policy No. AEC 5228803 00 (the "AGLI

8   Policy").  Labrador Decl., ¶¶ 2-3 and Exh. A (AGLI Policy))  The AGLI Policy provides $50 million

9   in total defense and/or indemnity coverage in excess of $66 million and "follows form," *i.e.*, contains

10  the same terms and conditions as the XL 01-02 Policy including, explicitly, the Advertising Liability

11  coverage grant in the XL 01-02 Policy.  Once Intel exhausted its retention, fronting policy and the XL

12  01-02 Policy, the AGLI Policy was triggered.  The AGLI Policy expressly provides:

13  Coverage under this policy will not apply unless and until the ***insured*** or

14  the insured's underlying insurance has paid or is obligated to pay the full

15  amount of the Underlying Limits of Insurance stated in Item 6.B. of the

16  Declarations [$50 million].

17  *Id*., AGLI Policy, at § V, H (When Damages Are Payable) (emphasis added).

18  **2.    The Underlying XL Policy**

19  Since the AGLI Policy follows form to the conditions of the underlying XL 01-02 Policy, the

20  wording of the XL 01-02 policy is the wording the Court must construe.  Under the XL 01-02 Policy,

21  AGLI agreed to:

22  [D]efend any suit against the Insured alleging such injury or destruction

23  and seeking damages on account thereof, even if such suit is groundless,

24

25  _____

26  [3] XL also issued Commercial Umbrella Policy No. HFL 004-27-84-98 (the "XL 00-01 Policy") during
    the policy period of April 1, 1998 to April 1, 2001.  The XL 00-01 Policy also covers Advertising

27  Liability, which is defined in exactly the same manner as the XL 01-02 Policy, quoted above.  Indeed,
    the entire XL 00-01 Policy contains the same language as the XL 01-02 Policy with the exception of
    underlying retentions and policy limits.  Labrador Decl., ¶¶ 2, 5 and Exh. C (XL 00-01 Policy).

28

-6-

1    false, or fraudulent, and to pay all Allocated Claims Expenses . . . .

2  Labrador Decl., ¶¶ 2, 4 and Exh. B (XL 01-02 Policy, at § II).

3        "Allocated Claims Expenses" is a specifically defined term in the XL 01-02 Policy which

4  includes

5            (1) all expenses incurred by [Intel] . . . in connection with the

6            investigation of claims, adjustment of claims, and the settlement or trial

7            of suits . . . . (2) to attorneys, experts . . . and for services in connection

8            with the investigation and settlement of claims and the defense of legal

9            proceedings against [Intel].

10  *Id.* (XL 01-02 Policy, at § III (G)).

11       As quoted in full in Section II, B, 1 *supra*, the XL 01-02 Policy covers liability on account of

12  "Advertising Liability" which is defined to include: "offenses such as, but not limited to . . . unfair

13  competition . . . committed, or alleged to have been committed, in any . . . advertisement [or]

14  promotion . . . ."   *Id.* (XL 01-02 Policy, at § III (E)).

15       Once the retention beneath the XL 01-02 Policy was exhausted through defense costs, or

16  indemnity payments, or both, XL was required to pay promptly all defense and indemnity costs and

17  expenses incurred by Intel up to its $50 million policy limit.   *Id.*  (XL 01-02 Policy, End. 7).

18       **C.    The *Intel v. XL* Action**

19       In April 2006, Intel initiated a declaratory relief and breach of contract lawsuit entitled *Intel*

20  *Corporation v. XL Insurance America, Inc.*, Superior Court of California for the County of Santa

21  Clara, Case No. 1-06-CV-061620, against XL after it refused to honor its duty to defend Intel in two

22  class action lawsuits, unrelated to the claims alleged in the Underlying AMD Actions.  RJN, ¶ 4 and

23  Exh. D (*Intel v. XL* Complaint).  Those unrelated underlying lawsuits are known as *Barbara's Sales,*

24  *Inc., et al. v. Intel Corporation, et all*, Madison County, Illinois Case No. 02-L-788 ("the *Barbara's*

25  *Sales* Action") and *Janet Skold, et al. v. Intel Corporation, et al.*, Superior Court of California, County

26  of Alameda (later transferred to Santa Clara County) Case No. RG 04145635 (the "*Skold* Action").

27  RJN, ¶ 4 and Exh. D (*Intel v. XL* Complaint at ¶¶ 15 and 16).  Ultimately, after the Court ruled that XL

28

-7-

1  had a duty to defend Intel, in May 2008, Intel and XL entered into a Settlement Agreement and

2  Release (the "XL Settlement Agreement") whereby, in exchange for a certain sum, Intel released any

3  claims against XL, under both the XL 00-01 and XL 01-02 Policies, for not only the *Barbara's Sales*

4  and *Skold* Actions, but for the Underlying AMD Actions as well.  RJN, Exh. G (February 7, 2008

5  Order After Hearing) (under seal); Labrador Decl., ¶ 6 and Exh. D (XL Settlement Agreement) (under

6  seal).  This settlement by its terms and Intel's own payment of defense costs exhausted the XL 01-02

7  Policy, even though the underlying XL lawsuit involved other actions, thereby triggering AGLI's

8  obligation to provide a defense for the Underlying AMD Actions.

9  **III.    ARGUMENT**

10         **A.    Summary Judgment Standard**

11         Summary judgment is appropriate when, as here, there are no disputed issues of material fact as

12  to issues of liability and the moving party is entitled to prevail as a matter of law.  Fed. R. Civ. P.

13  56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986).  A court

14  should grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials

15  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

16  movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c)(2).  As shown below, these

17  standards are satisfied here.

18         **B.    The Liberal Rules of Policy Interpretation**

19         Because an insurance policy is a contract, the general rules of contract interpretation apply to

20  the interpretation of the AGLI and XL 01-02 Policies.  *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807,

21  821-22 (1990) ("*AIU*").  The fundamental goal of contract interpretation is to give effect to the mutual

22  intent of the parties at the time the contract was formed, and that mutual intent is to be inferred, if

23  possible, solely from the written provisions of the contract.  *See* Cal. Civ. Code §§ 1636 &  1639; *AIU*,

24  51 Cal. 3d at 822; *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992) ("*Bank of the*

25  *West*").

26         Absent evidence that a technical meaning was intended by the parties, an insurance policy

27  should be read in its "ordinary and popular sense" and given its "plain meaning."  *AIU*, 51 Cal. 3d. at

28

821-22; *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 666-67 (1995) ("*Montrose II*") ("If the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning."). Moreover, policy language must be interpreted in context and with regard to its intended function and the structure of the policy as a whole. *See* Cal. Civ. Code § 1641. As the California Supreme Court explained, "[t]he nature of the damage and the risk involved, in light of particular policy provisions, control coverage." *Vandenberg v. Superior Court*, 21 Cal. 4th 815, 839 (1999) ("*Vandenberg*").

When the terms of a policy are clear and unambiguous, a court is under a duty to construe and enforce them as written. *AIU*, 51 Cal. 3d at 822. The Court should attempt to give meaning to each part of the policy. Cal. Civil Code § 1641. However, if policy language is susceptible to more than one reasonable interpretation, then it is deemed ambiguous. *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 867 (1993). In that situation, California courts hold that the policy must be interpreted in favor of the policyholder, in this case Intel, and against the insurance company, in this case AGLI, in order to afford the very protection that the policyholder was endeavoring to secure when applying for the insurance. *See e.g. Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 269 (1966) ("*Gray*"). Most importantly, the Court should resolve any ambiguity by protecting the objectively reasonable coverage expectations of the policyholder. *Bank of the West*, 2 Cal. 4th at 1264-65. The reasonable coverage expectations of the policyholder are to be honored even when the policyholder is a large corporation. *AIU*, 51 Cal. 3d at 823-24. Thus, any ambiguity in the AGLI Policy, or the XL 01-02 Policy, must be resolved in favor of Intel's reasonable expectations of coverage.

California courts "generally interpret the coverage clauses of insurance policies broadly, [in order to protect] the objectively reasonable expectations of the insured." *Montrose II*, 10 Cal. 4th at 667 (brackets in the original). In contrast, any exclusions or limitations on coverage in an insurance policy must be "*strictly construed against the insurer and liberally interpreted in favor of the insured*." *Delgado v. Heritage Life Ins. Co.*, 157 Cal. App. 3d 262, 271 (1984) (emphasis added). Accordingly, the Advertising Liability coverage provision in the AGLI Policy must be interpreted liberally in Intel's

1  favor.

2     **C.     The Duty To Defend Is Much Broader Than The Duty To Indemnify.**

3        Liability insurance policies, such as the Policy that AGLI sold to Intel, impose two separate and

4  distinct duties upon the insurance company:  (i) the duty to *defend* suits against the policyholder, and

5  (ii) the duty to *indemnify* the policyholder for the damages it must pay by adjudication or compromise.

6  The instant Motion concerns *only* the duty to defend.[4]

7        It is well settled under California law that the duty to defend is much broader than the duty to

8  indemnify.  Indeed, the duty to defend exists where there is a mere *potential* or *possibility* of coverage.

9  *Gray*, 65 Cal. 2d at 275-77; *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 299-300 (1993)

10  ("*Montrose I*"); *N. Am. Bldg. Maint., Inc. v. Fireman's Fund Ins. Co.*, 137 Cal. App. 4th 627, 637-638

11  (2006).  The duty to defend even extends to claims that are groundless, false or fraudulent.  *Horace*

12  *Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1086 (1993) ("*Horace Mann*").  Whether or not the

13  policyholder is likely to be exonerated with regard to the underlying claim is irrelevant.  *A-H Plating*

14  *Inc. v. Am. Nat'l Fire Ins. Co.*, 57 Cal. App. 4th 427, 442-43 (1997).

15        A policyholder's right to a defense by its insurance company is strongly protected under

16  California law.  *Montrose I*, 6 Cal. 4th at 295-96.  Any doubt or uncertainty as to whether a potential

17  for coverage exists must be resolved in favor of the policyholder and against the insurance company.

18  *Horace Mann*, 4 Cal. 4th at 1081; *Wausau Underwriters Ins. Co. v. Unigard Sec. Ins. Co.*, 68 Cal.

19  App. 4th 1030, 1036 (1998) ("*Wausau Underwriters*").

20        To determine whether a duty to defend exists, the Court should first compare the text of the

21  insurance policy with the text of the underlying complaint.  *Horace Mann*, 4 Cal. 4th at 1081.  If a

22  *potential* for coverage exists as a result of this comparison, then the insurance company must defend.

23  *Id.*  The duty to defend is to be determined at the time of the tender of the underlying action.  *Montrose*

24

25  ─────────────────────

26  [4] Indeed, as Intel has advised, at the specific request of the Delaware Superior Court in the action
entitled *American Guarantee and Liability Insurance Company v. Intel, et al*, that Intel seeks only a
defense and costs of defense for the Underlying AMD Actions.  RJN, Exh. H (December 11, 2009

27  letter to Hon. Jerome O. Herlihy) (under seal) and Exh. I (January 14, 2010 letter to Hon. Jerome O.
Herlihy) (under seal).

28

1   *I*, 6 Cal. 4th at 295.  It is to be determined not only on the basis of the allegations in the underlying

2   complaint, but also on the basis of any other information available to the insurance company.  *Id.* at

3   296-99.  So even if, after initial examination it appears that the specific pleading of the claims does not

4   establish a potential for coverage, but the *factual allegations* are such that an amendment of the

5   pleading might bring it within the potential for coverage, then the insurance company must defend.

6   *Barnett v. Fireman's Fund Ins. Co.*, 90 Cal. App. 4th 500, 510 (2001); *Montrose I*, 6 Cal. 4th at 296.

7       The insurance company bears a heavy burden of proof with respect to the duty to defend.

8   "[T]he insured need only show that the underlying claim *may* fall within policy coverage; the insurer

9   must prove it *cannot*."  *Montrose*, 6 Cal. 4th at 300 (emphasis added).  An insurance company is

10  excused from defending only when "the third party complaint can *by no conceivable theory raise a*

11  *single issue* which could bring it within the policy coverage."  *Id.*, quoting *Gray*, emphasis added.

12      Once the duty to defend arises, it extends to all portions of the underlying complaint.  *Buss v.*

13  *Superior Court*, 16 Cal. 4th 35, 48-49 (1997).  The insurance company must defend the entire action in

14  full, and cannot limit its defense obligation to only the potentially covered portions of the action.

15  *Horace Mann*, 4 Cal. 4th at 1084.  Until the underlying action is concluded, or the insurance policy

16  becomes exhausted by its terms, the insurance company's duty to defend *continues* to exist, unless at

17  some point the insurance company can affirmatively prove, through an adjudication in a coverage

18  action, that there is no longer ***any possibility*** of coverage.  *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal.

19  4th 643, 655-56 (2005).

20      If the insurance company believes that an *exclusion* in its policy eliminates any possibility of

21  coverage, it has the burden of *conclusively* proving the applicability of that exclusion through

22  *undisputed facts*.  *See Wausau Underwriters*, 68 Cal. App. 4th at 1037-38.  If the exclusion involves a

23  factual dispute, particularly a factual dispute that is *also* involved in the underlying claim against the

24  policyholder, then the insurance company must defend the policyholder and cannot rely upon the

25  exclusion as a basis for denying its defense obligation.  *Century Sur. Co. v. Polisso*, 139 Cal. App. 4th

26  922, 950-951 (2006) ("*Polisso*").

27

28

-11-
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTEL'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

**D.** **AGLI Has A Duty To Defend The Underlying AMD Actions.**

    **1.** **The Allegations Of The Underlying Complaints Are At Least *Potentially* Covered Under The Advertising Liability Coverage Wording At Issue.**

        **a.** **The underlying complaints allege "offenses" arising from Intel's "advertisement" or "promotion."**

Under the Advertising Liability coverage of the AGLI Policy and the underlying XL 01-02 Policy to which it follows form ("the Policies"), AGLI must defend any suit that alleges an offense arising from advertising or promotional activities. The definition of Advertising Liability is an "[i]njury arising out of *offenses such as, but not limited to* [a list of offenses] committed, or alleged to have been committed, in any . . . *advertisement*, *promotion* . . . ." Labrador Decl., ¶¶ 2, 4 and Exh. B (XL 01-02 Policy, at § III (E)) (emphasis added).

The complaints in the Underlying AMD Actions unquestionably allege "offenses" against Intel. Because the XL 01-02 and AGLI Policies do not contain a specific definition of the word "offenses," the plain meaning of that word should govern. *AIU*, 51 Cal. 3d at 821-22. Courts regularly turn to standard dictionaries to ascertain the plain meaning of words. *See e.g. Scott v. Continental Ins. Co.*, 44 Cal. App. 4th 24, 29-30 (1996). One of the standard dictionary meanings of the word "offense" is "an infraction of law" (s*ee e.g.* Webster's Collegiate Dictionary, Tenth Edition, 1996), or a "transgression of law" (*see e.g.* The American Heritage College Dictionary, Third Edition, 2000). Each one of the claims set forth in the Underlying AMD Actions' complaints alleges an "infraction" or "transgression" of law. Indeed, each one cites a specific statute and alleges that Intel's conduct has violated that statute. In particular, the AMD Complaint alleges that Intel violated Section 2 of the Sherman Act and Section 17045 of the California Business and Professions Code. RJN, Exh. A (*AMD v. Intel* Complaint, ¶¶ 130-157). The first and second causes of action in the Master Class Action Complaint allege that Intel violated the Cartwright Act (Cal. Bus. & Prof. Code §§ 16720 and 16727), which is the state's general antitrust law prohibiting restraints of trade. Likewise, the plaintiffs in the *Paul* Complaint include a cause of action for violation of twenty different state antitrust statutes, including California's Cartwright Act (RJN, Exh. B (*Paul* Complaint, ¶¶ 74-96)), which includes a damages

1    remedy.  *See* Cal. Bus. & Prof. Code §§ 16750(a).

2          Moreover, the Underlying AMD Actions complaints unquestionably allege that these

3    "offenses" were committed in Intel's "advertisement" and/or "promotion" activities.  Because Intel's

4    promotional discounting programs are at the heart of the Underlying AMD Actions complaints, the

5    term "promotion," which is not defined in the AGLI or XL 01-02 Policy, must be interpreted using its

6    plain meaning.  *AIU*, 51 Cal. 3d at 821-22.  Thus, a standard dictionary definition of the word

7    "promotion" must be applied.  Webster's Dictionary defines "promotion" as:

8                    1. the act or fact of being raised in position or rank: PREFERMENT; 2.

9                    the act of furthering the growth or development of something; esp: the

10                   furtherance of the acceptance and sale of merchandise through

11                   advertising, publicity, or discounting – promotional.

12   Webster's Collegiate Dictionary, Tenth Edition, 1996.

13         As demonstrated herein, the complaints in the Underlying AMD Actions contain allegations

14   that it was Intel's advertising and promotion activities which gave rise to the alleged wrongs.  *See e.g.,*

15   RJN, Exh. A (*AMD v. Intel* Complaint, ¶ 33) (alleging that Intel engaged in "relentless marketing" via

16   its use of the Intel Inside Program, a promotional discounting program which reimburses licensees for

17   advertising Intel products); RJN, Exh. B (*Paul* Complaint, ¶ 61); and RJN, Exh. C (Master Complaint,

18   ¶¶ 98-99) (alleging that Intel provided retailers with "cooperative advertising support" and creating

19   "marketing-related opportunity" through the use of Intel's market development funds, another

20   promotional discount program designed to increase the volume of Intel's sales).  In essence, AMD and

21   the class action plaintiffs alleged that Intel used its market development and promotional discounting

22   programs to restrict computer manufacturers from purchasing or advertising AMD products.

23         In addition to the allegations in the Underlying AMD Actions complaints, the materials that

24   were available for AGLI's review at the time it denied coverage to Intel further highlight the potential

25   for coverage.  Those materials are Intel documents selected by AMD for production in the AMD

26   Action.  Chaney Decl., ¶ 2.  Some of the many examples available to AGLI prior to its denial of

27   coverage include:

28

-13-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTEL'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

1

2

3
**REDACTED**

4

5

6

7

8

9

10

11
**REDACTED**

12

13

14

15

16

17

18

19

20

21

22

23
**REDACTED**

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTEL'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

**HOWREY LLP**

1

2

3

4                                          **REDACTED**

5

6

7

8

9   Chaney Decl., ¶¶ 4-13 and Exhs. B – K, respectively (under seal).

10        In addition to these examples, the Settlement Agreement between Intel and AMD confirms that

11   the AMD Action involved Intel's alleged promotional and advertising practices.  RJN, Exh. F (Intel 8K

12   – Settlement Agreement).  Section 2.0 of the Settlement Agreement broadly defines practices which

13   Intel has agreed to refrain from in the future.  Section 2.1 is entitled "Sales and Marketing Practices:

14   Customers" and Section 2.2 is entitled "Sales and Marketing Practices: Retailers, Distributors,

15   [Original Design Manufacturers] and End Users."  *Id.*  Similarly, Section 2.4 of the Settlement

16   Agreement expressly defines under what circumstances the advertising and promotional business

17   practices would not be considered a breach of the Settlement Agreement.  *Id.*  Section 2.4.3 provides:

18                Intel may, without violating this Agreement, limit a Third Party's use of

19                its *market development funds or other promotional funds* to the

20                promotion of Intel and Intel-based products unless such limitation

21                includes a Restriction.  "Restriction" shall mean a requirement imposed

22                or required by or on behalf of Intel that the recipient of *market*

23                *development funds or other promotional funds* from Intel ("Recipient")

24                may not include AMD or AMD products in a portion of an OEM catalog,

25                retailer, circular, web page or site, point-of-sale marketing piece, or

26                event where such respective portion is not funded by Intel.  The Intel

27                Inside Program rules dated as of April 1, 2009 are conclusively

28

-15-
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTEL'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

1    presumed permissible under this Agreement, except to the extent they

2    include a Restriction.

3  *Id*. (Settlement Agreement, § 2.4.3) (emphasis added).

4         **b.     The offenses do not have to be "like" the offenses listed in the**

5                **Policies' definition of Advertising Liability.**

6         The word "offenses" in the Policies' definition of Advertising Liability is ***not*** restricted by the

7  phrase which immediately follows it, *i.e.*, "such as, but not limited to [a list of offenses]." Instead, this

8  phrase merely gives *some examples* of offenses that might arise from advertising and promotion

9  activities. It does not eliminate coverage for any *other* offense that might arise from advertising or

10 promotion activities.

11        Courts interpreting statutory language have held that even just the phrase "such as," followed

12 by a list of specific items, is *illustrative* and not exclusive. *See e.g. Abbott v. Bragdon*, 912 F. Supp.

13 580, 586 (D. Me. 1995) (the phrase "such as . . ." in ADA guidelines is illustrative and not exclusive);

14 *Abenante v. Fulflex, Inc.*, 701 F. Supp. 296, 301 (D.R.I. 1998) (same with respect to the phrase "such

15 as . . ." in ADEA). In other words, the purpose of the list of specific items that follows the phrase

16 "such as" is to give a few concrete examples of the category, but not to restrict the meaning of the

17 category in any way.

18        In this case, such an interpretation is made inescapable by the parties' specific addition of the

19 words "***but not limited to***." Those words remove any doubt as to what the parties intended. The

20 parties did *not* intend the list of specific items to limit the category that is covered, *i.e.*, offenses arising

21 from advertising or promotion activities. A contrary interpretation would ignore the words "but not

22 limited to," and give them no meaning whatsoever. The rules of contract interpretation prohibit such a

23 result. *See e.g.* Cal. Civ. Code § 1641.

24        California courts have interpreted the words "but not limited to" in accordance with Intel's

25 view. For example, in *People v. Clark-van Brunt*, 158 Cal. App. 3d Supp. 8 (1984), the court

26 interpreted a criminal statute which proscribed "drug paraphernalia." That category was followed by a

27 list of specific items which was introduced with the words "but is not limited to." The court

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTEL'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

1  interpreted the latter words as follows:

2      The clear import of the phrase "but is not limited to" signifies that the

3      Legislature intended the definition of "drug paraphernalia" to be

4      *expansive* and **flexible**.  Thus, the expressly enumerated items are **simply**

5      **exemplary** of those items which may constitute "drug paraphernalia"

6      **rather than delineating the parameters of the subject**.

7  *Id.* at Supp. 17-18, emphasis added.  In this case, the AGLI and XL 01-02 Policies' coverage for

8  offenses arising from advertising or promotion activities is also "expansive and flexible."  The

9  specifically enumerated offenses are "simply exemplary" and *do not* "[delineate] the parameters of the

10  subject."

11      Although no reported California decision has interpreted the entire phrase "such as, but not

12  limited to [a list of specific items]," this phrase is analogous to the phrase "including," or "including,

13  but not limited to," followed by a list of specific items.  *See e.g., White v. Texas,* No. 07-00-0473-CR,

14  2002 Tex. App. LEXIS 5196, *11 (Ct. App. Texas, July 24, 2002).  California courts have held that the

15  phrase "including," followed by a list of items, does not restrict the category in any respect.  *Flanagan*

16  *v. Flanagan*, 27 Cal. 4th 766, 774 (2002) ("'Includes' is 'ordinarily a term of enlargement rather than

17  limitation.' . . . The 'statutory definition of a thing as "including" certain things does not necessarily

18  place thereon a meaning limited to the inclusions.'"); *Ortega Rock Quarry v. Golden Eagle Ins. Corp.*,

19  141 Cal. App. 4th 969, 982 (2006) (same).  The phrase "including, but not limited to" is *also* expansive

20  rather than limiting, and the specific items listed thereafter do *not* restrict the meaning of the category

21  at issue.  *People v. Gonzalez*, 116 Cal. App. 4th 1405, 1414 (2004).

22      In *H.E. Williams Inc. v. U.S. Fire Ins. Co.*, No. 89-5083-CV-SW-1, 1991 U.S. Dist. LEXIS

23  1017, *3 fn.3 (W.D. Mo. Jan. 28, 1991), the court interpreted the specific phrase "such as but not

24  limited to [a list of offenses]" in a definition of "personal injury" in a liability insurance policy.  The

25  policyholder was sued by a former employee for retaliatory discharge.  The policy defined "personal

26  injury" as "injury, *such as but not limited to*; libel, slander, defamation of character, . . . ."  *Id.* at *3

27  Fn. 3 (emphasis added).  The court held that if the insurance company was arguing that the retaliatory

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTEL'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

1    discharge claim in the underlying complaint did *not* satisfy this definition, it was plainly mistaken.

2              Based on the expansive language used to define "personal injury" (". . .

3              injury, such as but not limited to"), it is this court's belief that the

4              definition of personal injury would incorporate ***any*** tortious action

5              directed at a person that is not excluded by the policy's definition of

6              "occurrence."

7    *Id.* at *4 fn. 6 (emphasis added).[5]   The *H.E. Williams* decision establishes that Intel's interpretation of

8    the phrase "such as, but not limited to [a list of offenses]" is the correct one.

9              If AGLI intended to limit the types of offenses which would give rise to its Advertising

10   Liability coverage, it should not have followed form to the XL 01-02 Policy wording, but should

11   instead have sold Intel a policy that used a different definition of Advertising Injury.  AGLI could have

12   insisted, for example, on using the standard form industry definition of "advertising injury" that limits

13   the coverage to a list of specifically enumerated offenses.  In sharp contrast, the Advertising Liability

14   definition in the Policies at issue contains no limitation on the types of "offenses."  *See* Appendix A

15   hereto for a side-by-side comparison of the relevant language.  AGLI did not insist upon the standard

16   from definition for the Policies at issue.  Significantly, however, AGLI did refuse to use the broader

17   wording in the policy it sold to Intel for the 2002-2003 policy period.  Labrador Decl., ¶ 7 and Exh. E

18   (AGLI 02-03 Policy) (under seal).  Thus, AGLI clearly knew about and could have used more

19   restrictive wording.

20              **c.        The offenses alleged in the Underlying AMD Actions constitute**

21                      **"unfair competition," as one of the listed offenses.**

22              Finally, the claims set forth in the Underlying AMD Actions constitute claims for "unfair

23   competition," which is one of the offenses specifically listed in the Advertising Liability definition of

24   the Policies.  Given the liberal construction that must be given to grants of insurance coverage,

25   particularly with regard to the duty to defend, these claims establish AGLI's defense obligation.

26

27   [5] The court then held that the underlying claim also satisfied the definition of an "occurrence" of
     personal injury.

28

1   The complaints in the Underlying AMD Actions allege that AMD and consumers have been

2   harmed by deceptive practices on the part of Intel, in part because those practices disrupt fair

3   competition in the marketplace.  The plaintiffs in the Consumer Class Actions specifically allege that

4   Intel has been engaged in *unfair competition*.  RJN, Exh. B (*Paul* Complaint, ¶¶ 97-114 (Count II –

5   alleging violation of state consumer protection statutes, including California's Unfair Competition

6   Act)); RJN, Exh. C (Master Complaint, ¶¶ 119-123 (Third Cause of Action alleging violation of

7   California Unfair Competition Act)).

8   This Court found advertising liability coverage for unfair competition claims in *Hewlett-*

9   *Packard Co. v. Cigna Prop. & Cas. Ins. Co.*, No. 99-20207SW, 1999 U.S. Dist. LEXIS 20655 (N.D.

10   Cal. Aug. 24, 1999) ("*Cigna*") and *Hewlett Packard Co. v. Ace Prop. & Cas. Co.*, 2003 U.S. Dist.

11   LEXIS 3586 (N.D. Cal. Mar. 3, 2003) ("*ACE*").  In *Cigna*, the Honorable Spencer Williams found that

12   the insurer, Cigna, was required to defend Hewlett Packard ("HP") against underlying counterclaims

13   alleging that HP marketing materials contained misrepresentations that caused competitive injury to

14   Nu-Kote, a maker of printing supplies.  *Cigna* at *1.  The policy at issue contained standard form

15   advertising liability language which included "unfair competition."  The Court reasoned that the policy

16   provided no definition of unfair competition and that *Bank of the West v. Superior Court*, 2 Cal. 4th

17   1254 (1992) did not narrow the concept of unfair competition solely to "passing off" or "palming off"

18   of goods.  *Cigna* at *16-17.  Ultimately, the Court found that

19            because 'unfair competition' is commonly understood to encompass

20            claims for false advertising and other tortious conduct resulting in

21            competitive injury, the Court believes that 'unfair competition' as

22            presented in the Cigna Policy encompasses the claim for unfair

23            competition alleged in the Nu-Kote Counterclaim.

24   *Id*. at *19-20.

25   Several years later, in *ACE*, the insurance company (ACE) filed a motion for summary

26   judgment with respect to its duty to defend the Nu-Kote counterclaims asserted against HP.  The

27   Honorable James Ware, however, recognized that in 1998 Judge Williams already found that ACE

28

-19-

1  owed HP a defense under the "advertising injury" coverage of its policy relating to Nu-Kote's

2  counterclaims against HP for false and deceptive advertising under the Lanham Act, and for unfair

3  competition under California statutory and common law.  *ACE* at *3.  As a result, the Court deemed

4  ACE's motion for summary judgment to be an improper motion for reconsideration.  *Id*. at *7.

5  Nonetheless, the Court reexamined the issues in light of ACE's contention that its motion was based

6  on new evidence and new case law.  *Id*.  Citing *Industrial Indem. Co. v. Apple Computer Inc.*, 79 Cal.

7  App. 4th 817 (1999), ACE argued that its policy's occurrence definition required that both the act and

8  the injury take place outside of the United States.  *ACE* at *11.   The Court rejected this argument by

9  distinguishing the Industrial Indemnity policy's coverage for "offenses" versus ACE's coverage for

10  "occurrences."  *Id*. at *14.  The Court also rejected ACE's argument that Judge Williams' prior ruling

11  failed to address the issue of whether the inclusion of a package insert in HP's product packaging

12  constituted "advertising activities" as that term has been construed by California courts.  Instead, the

13  Court found that "California courts have only generally defined 'advertising' to mean dissemination of

14  promotional material to the public" and "[i]n the absence of binding caselaw holding that package

15  inserts can never constitute 'advertising,' ACE [could] not conclusively negate the potential for

16  coverage."  *Id*. at *16-17.

17        Contrary to what AGLI may argue, the duty to defend allegations of violations of California

18  Business & Professions Code § 17200 is not precluded by *Bank of the West*.[6]  First, *Bank of the West*

19  did not involve the consumer protection statutes that are discussed above.  Therefore, it provides no

20  guidance on whether violations of *those* statutes potentially constitute "unfair competition" under

21  AGLI's Policy.  If any claim in an underlying complaint is potentially covered, after giving all benefit

22  of the doubt to the policyholder, it makes no difference if other claims are *not* covered.  *Horace Mann*,

23  4 Cal. 4th at 1084.  The insurance company must defend the whole action.  *Id*.  Thus, even if there

24  were no coverage for violations of Section 17200 *et seq.*, AGLI's full defense obligation, based upon

25  the other statutory claims, would not be affected.

26

27

28

[6] There is no California Business & Professions Code § 17200 claim in the AMD Complaint itself.

Second, *Bank of the West* involved the standard form CGL policy definition of advertising injury that, as demonstrated in Appendix A hereto, is markedly different from the Advertising Liability definition in the AGLI and XL 01-02 Policies.  The list of offenses in the Policies at issue here is both non-exclusive and composed differently than the standard form CGL Policy definition at issue in *Bank of the West*.  Thus, the context for the California Supreme Court's *Bank of the West* 1992 discussion of "unfair competition," *i.e.*, the standard form CGL policy definition, is simply not the same as that of the phrase "unfair competition," as used in the AGLI Policy, many years later.

Third, *Bank of the West* involved only the duty to *indemnify* and not the duty to *defend*. Accordingly, the California Supreme Court was not employing the broad and liberal rules of construction that are required with respect to the duty to defend.  Employing those rules compels the conclusion that the claims in the Underlying AMD Actions complaints *potentially* constitute claims for "unfair competition."[7]

In *Bank of the West*, the Supreme Court actually held that because Business & Professions Code Section 17200 *et seq*. did not authorize any claims for monetary damages, the insurer was not required to indemnify the settlement of such a claim because of the "as damages" requirement in the policies at issue.  *Bank of the West,* 2 Cal. 4th at 1272.  Here, the Underlying AMD Actions complaints specifically seek an award of *monetary damages.*  .  RJN, Exh. A (AMD v. Intel Complaint, p. 47, ¶¶ A-C); RJN, Exh. B (*Paul* Complaint, p. 27, ¶ C); RJN, Exh. C (Master Complaint, p. 27, ¶ 5).[8]

---

[7] In connection with the insurance company's duty to *indemnify* a violation of Section 17200 *et seq.*, the Supreme Court, in dicta, expressed some concern about the public policy implications of allowing a party to pass its statutory liability on to its insurers.  *Bank of the West*, 2 Cal. 4th at 1267.  Here, no such public policy implications exist, because the issue is AGLI's duty to *defend* allegations that Intel violated 15 other state's consumer protection statutes, *as well as* California's Section 17200 *et seq*. and various states' antitrust statutes.  *See Horace Mann*, 4 Cal. 4th at 1084 (the test for coverage is "not . . . whether non-covered acts predominate in the third party's action, but rather . . . whether there is any potential for liability under the policy.")

[8] Although the Supreme Court also noted that courts have equated the term "unfair competition" with the tort of "passing off" one's goods for those of another, it did *not* hold that the phrase "unfair competition," in all insurance policies and for all time, can only mean that particular tort.  *See e.g. Cigna* at *17 ("This Court is persuaded that "unfair competition," as commonly understood, includes claims for damages beyond just passing off or palming off of goods."); *see also Am. Cyanamid Co. v. Am. Home Assurance Co.*, 30 Cal. App. 4th 969, 976 fn. 3 (1994) (noting that *Bank of the West* left *unanswered* the question of whether "unfair competition" also encompasses violations of anticompetitive business practice statutes when damages are available); *Cigna*, 1999 U.S. Dist. LEXIS
(Continued...)

1    Finally, even if this Court concludes that the claims in the Underlying AMD Actions are not,

2  *per se*, "unfair competition" claims, it should still conclude that they are sufficiently "like" unfair

3  competition claims to establish a potential for coverage, and therefore, AGLI's duty to defend.[9]  The

4  required liberal interpretation compels this conclusion and for this alternative reason, AGLI's duty to

5  defend exists.

6              **2.      The Policies Do Not Contain An Antitrust Exclusion**

7            Neither the XL 01-02 Policy nor the AGLI Policy contain an antitrust exclusion, which

8  typically bars coverage "arising out of antitrust violations, restraint of trade, or unfair competition, or

9  violations of the Sherman Act, the Clayton Act or the Robinson-Patman Act"[10] or for "personal and

10  advertising injury [including malicious prosecution] arising out of a violation of any anti-trust law."[11]

11  AGLI could have insisted on the use of such an exclusion.  It did not.  California insurance law is clear

12  that in the absence of an express exclusion, it is not the court's role to include limitations on coverage

13  that are not set forth in the policy because the "draftsmen had it within their power to make clear the

14  full scope of the coverage offered as well as any limitations they wished to place thereon".  *Lebas*

15  *Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group*, 50 Cal. App. 4th 548, 567, n. 13 (1996).[12]

16

17  ───────────────

     (...Continued)

18  20655 at *16-17 (reasoning that *Bank of the West* did not narrow the concepts of unfair competition
     solely to "passing off" or "palming off" of goods).  Dicta in *Bank of the West* concerning the tort of
19  "passing off" simply does not control the result in this case.

20  [9] Indeed, this Court in *Cigna* explicitly held that "unfair competition" included statutory claims of
     unfair competition.  *Cigna* at *16-17.

21  [10] *See Live Nation, Inc. v. Ill. Nat'l Ins. Co.*, No. 07-56658, 2009 U.S. App. LEXIS 3401 (9th Cir. Feb.
22  20, 2009) (affirming district court's finding that antitrust allegations did not fall within a professional
     liability policy's definition of "wrongful acts," such as invasion, infringement or interference with the
23  right of publicity and even if the alleged conduct could fall within the affirmative coverage grant of the
     policy, the exclusion which barred coverage for claims based on antitrust or unfair competition would
24  preclude such coverage).

25  [11] *See Reagan Nat'l Adver. v. Hartford Cas. Ins. Co.*, No. 05-4131, 2006 U.S. App. LEXIS 18744
     (10th Cir. July 24, 2006) (affirming district court's denial of coverage because all allegations in the
26  underlying complaint arose out of alleged antitrust violations and the subject policy had an express
     antitrust exclusion, which precluded coverage for "personal and advertising injury [including malicious
     prosecution] arising out of a violation of any anti-trust law").

27  [12] Indeed, because the burden rests on the insurer to raise and prove the applicability of any exclusion
     of coverage and Intel does not believe that there are any applicable exclusions, it does not raise the
28                                                                                          (Continued...)

1    Accordingly, the Court may not read an antitrust exclusion into the AGLI or XL 01-02 Policies.

2         **E.      The XL 01-02 Policy Is Exhausted**

3         As noted in Section II, B, 1, *supra*, AGLI is required to respond to Intel's claim once the limits

4    of the underlying XL 01-02 Policy is exhausted.  In particular, the AGLI Policy provides, in pertinent

5    part:

6              Coverage under this policy will not apply unless and until ***the insured or***

7              ***the insured's underlying insurance*** has paid or is obligated to pay the

8              full amount of the Underlying Limits of Insurance stated in Item 6.B. of

9              the Declarations.

10             When the amount of damages is determined, we will promptly pay on

11             behalf of the insured the amount of damages covered under the terms of

12             this policy.

13   Labrador Decl., ¶¶ 2, 3 and Exh. A (AGLI Policy, at § V, H).

14        In other words, either Intel or XL, or a combination of the two, can exhaust the XL 01-02

15   Policy by paying the $50 million underlying limit of insurance.  The XL 01-02 Policy was exhausted

16   by XL's settlement with Intel concerning the *Barbara's Sales*, *Skold* and Underlying AMD Actions

17   and by Intel's own payment of its defense costs.  Accordingly, the condition in the AGLI Policy cited

18   above was satisfied because XL settled with Intel and paid a certain portion of the $50 million limit

19   and Intel paid the balance.  Labrador Decl., ¶ 6 and Exh. D (Confidential Intel - XL Settlement

20   Agreement (under seal)).  Although AGLI may argue that the XL 01-02 Policy cannot be exhausted

21   unless the underlying $50 million limit is "exhausted by payment of judgments or settlements,"

22   pursuant to Provision C of Endorsement 1 to the AGLI Policy, this argument fails because there is no

23   restriction placed on the word "settlement."

24        In particular, Provision C says nothing about settlement of an underlying action – it merely says

25   
     _____

26   (...Continued)

27   issue of any of the exclusions and/or limitations in the Policies in its Motion.  *Wausau Underwriters*,
     68 Cal. App. 4th at 1038.

28

1 "settlements." Here, the XL 01-02 Policy was exhausted by settlement between Intel and XL. To

2 require that an insurance policy only be triggered by either a judgment or settlement of the underlying

3 action where the policy specifically can be exhausted by the payment of defense costs would make the

4 defense coverage provided illusory. In this case, the XL 01-02 Policy was exhausted through

5 settlement which provided that the $50 million limits were expended by a combination of Intel's and

6 XL's funds for defense of matters, including the Underlying AMD Actions.

7      Additionally, because the AGLI Policy contains an "all sums" provision, and, as this Court

8 previously recognized, AGLI cannot require Intel to look to any other source, e.g., an insurance policy

9 in another time period, to off-set AGLI's obligation. Labrador Decl., ¶¶ 2, 4 and Exh. B (XL 01-02

10 Policy, at § III (F) ("Ultimate Net Loss" definition); *see Aerojet-General Corp. v. Transp. Indem. Co.*,

11 17 Cal. 4th 38 (1997) (when the defense obligation of more than one insurance policy period has been

12 triggered by a claim, the policyholder is entitled to choose which policy period will provide the

13 coverage); *see also* Doc. No. 66, June 11, 2009 Order Denying Motion to Dismiss or Stay (recognizing

14 same). Similarly, AGLI cannot rely on Intel's fronting policies to avoid its own coverage obligations.

15 Intel purchased two fronting policies from Old Republic Insurance Company ("ORIC") that cover $5

16 million of the retained limits which underlies the XL 01-02 Policy.[13] California courts have ruled that

17 the existence of fronting policies, such as the ORIC policies, do not excuse an insurance company from

18 performing its coverage obligations under its own policy. *See Aerojet*, 17 Cal. 4th at 71-72. In

19 *Aerojet*, the Supreme Court stated that the assumption that where there is no fronting arrangement, an

20 underlying insurer

21                   might have been required to make an equitable contribution to the

22                   defense costs. . . . does not compel the conclusion that, because it was

23                   issued 'fronting' policies . . . [the insured] should be required to make

24                   such a contribution itself. Although insurers may be required to make an

25                   equitable contribution to defense costs among themselves, that is all: An

26

27 [13] ORIC Policy No. MWZY 55259 covers the period April 1, 2001 to April 1, 2002. Labrador Decl., ¶ 8 and Exh. F.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTEL'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1 | insured is not required to make such a contribution together with

2 | insurers.

3 *Id.* at 72.

4 California decisions have affirmed that retentions and fronting agreements cannot be relied

5 upon by *other* insurers to avoid their policy obligations. *See, e.g.*, *CD Invest. Co. v. California Ins.*

6 *Guar. Ass'n.*, 84 Cal. App. 4th 1410, 1428 (2000) (evaluating impact of multiple insurance policies,

7 court held Guarantee Association was not entitled to offset its payments by limits of underlying

8 insolvent policies because to do so would mean that "the insured would be put in a worse position for

9 having bought two policies"); *Montgomery Ward & Co. v. Imperial Cas. & Indem. Co.*, 81 Cal. App.

10 4th 356, 365-70 (2000) (because retentions are not "underlying insurance" or "primary policies,"

11 insurers cannot seek contribution from insured under principle of horizontal exhaustion); *Truck Ins.*

12 *Exch. v. Amoco Corp.*, 35 Cal. App. 4th 814, 827-28 (1995) (insurers cannot seek equitable

13 contribution from a "self-insured" entity).

14 **IV.    CONCLUSION**

15 For each of the foregoing reasons, Intel respectfully requests that the Court grant Intel's Motion

16 for Summary Judgment.

17                                             Respectfully submitted,

18 Dated:  February 5, 2010                    HOWREY LLP

19

20

21                                        By:      /s/ Lester O. Brown

22                                             Lester O. Brown
                                              Attorneys for Plaintiff
23                                             Intel Corporation

24

25

26

27

28

-25-
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTEL'S MOTION FOR PARTIAL
SUMMARY JUDGMENT